# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,  )
                           )
Plaintiff,                 )
                           )  No. 17 C 8424
v.                         )
                           )  Judge Ronald A. Guzmán
ROBERT BRUNT,              )
                           )
Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Before the Court are Robert Brunt's pro se petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, motion for leave to file a third amended § 2255 petition, and motion for resentencing. For the reasons set forth below, the motion for leave to file a third amended § 2255 petition is granted in part and denied in part; the § 2255 petition, as amended, is denied; and the motion for resentencing is denied.

## BACKGROUND

Robert Brunt was charged with several counts of mail and wire fraud as well as one count of money laundering, in connection with "an elaborate real estate financing fraud scheme in Chicago during the housing bubble of the early 2000s." *United States v. Farano*, 749 F.3d 658, 660 (7th Cir. 2014). The scheme involved discounted purchases of properties from the Department of Housing and Urban Development (HUD) (under false pretenses), alleged rehabilitation of those properties, and sales of the properties at fraudulently inflated prices to fraudulently qualified mortgage-loan recipients. *Id.* Brunt's role was to recruit investors (the buyers of the properties) and appraisers, deal with a HUD-certified nonprofit entity that the participants in the scheme corrupted to buy properties

for them, and manage the cosmetic renovations. *Id.* at 663-64. A jury convicted Brunt and his codefendants, and the Court sentenced Brunt to a term of 151 months' imprisonment. Brunt was also ordered to pay $1,618,100.00 in restitution.

Brunt appealed, raising the following arguments: (1) the Court denied him his Sixth Amendment right to confront an adverse witness when it limited his cross-examination of codefendant Walter Jackson; (2) the Court clearly erred when it allowed the government to cross-examine Brunt with statements from his proffer to the government without a proper showing that Brunt's testimony was inconsistent with his proffer statements; (3) the cumulative effect of those errors denied Brunt his right to a fair trial; and (4) the Court plainly erred in its loss calculation for purposes of determining the applicable guideline sentencing range and restitution amount. The Court of Appeals affirmed Brunt's convictions and sentence, but remanded the case for recalculation of the restitution amount. On November 30, 2016, the Court entered an amended judgment order modifying the restitution amount to $1,077,540.00 but otherwise leaving the original sentence intact. Brunt did not appeal from the amended judgment.

In the instant petition for postconviction relief, Brunt raises several claims of ineffective assistance of counsel. He also seeks leave to file a third amended § 2255 petition.

## DISCUSSION

### A. Motion for Leave to File a Third Amended Section 2255 Petition

Brunt filed his § 2255 petition on November 20, 2017. He amended the petition shortly thereafter, on December 1, 2017. Briefing and some discovery ensued. On July 17, 2018, Brunt sought leave to file a second amended petition; the Court granted that motion and took additional briefs on the petition as amended. The amendments do not contain new claims, but merely

2

additional arguments concerning the existing claims. On September 20, 2018, Brunt moved for leave to file a third amended petition to assert eight claims. The government objects to the motion as to five of the claims on the ground that they do not relate back to the original petition and are therefore untimely.

Rule 12 of the Rules Governing Section 2255 Proceedings for the United States District Courts permits application of the Federal Rules of Civil Procedure in § 2255 cases "to the extent that they are not inconsistent with any statutory provisions or [the § 2255] rules." Federal Rule of Civil Procedure 15, which governs amendments to pleadings, provides that pleadings may be amended once as a matter of course without seeking leave of court. Fed. R. Civ. P. 15(a)(1). Thereafter, parties may amend their pleadings only with the opposing party's written consent or the court's leave, which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The claims in the amended pleading, however, must relate back to the original pleading. Fed. R. Civ. P. 15(c).

There is a one-year limitations period for postconviction challenges to federal convictions. 28 U.S.C. § 2255(f). After the statute of limitations has run, amendments to a pleading relate back to the original pleading if the original and amended pleadings arise out of the same "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c)(1)(B). An amendment to a § 2255 petition does not relate back (and thereby escape the one-year statute of limitations) merely because it relates to the same trial, conviction, or sentence as a timely-filed claim. *Beason v. Marske*, 926 F.3d 932, 938 (7th Cir. 2019) (citing *Mayle v. Felix*, 545 U.S. 644, 662 (2005)). To relate back, the new claims must be based on the same "common core of operative facts" as the original claims. *Id.*

The first four grounds of Brunt's original § 2255 petition are claims that trial counsel were constitutionally ineffective. Brunt contends that Jeffrey Steinback, Lawrence Beaumont, and

3

Raymond Pijon were ineffective for failing to learn that the mortgage companies described in the indictment were not insured by the Federal Deposit Insurance Corporation ("FDIC") and failing to move to dismiss the indictment on that basis (Ground One); that Pijon and Joshua Sachs were ineffective for failing to challenge the jury instructions as to a "financial institution" (Ground Two); that Steinback, Beaumont, Pijon, and Sachs were ineffective for failing to convey a formal plea offer to him (Ground Three); and that Steinback and Beaumont were ineffective for misleading him into submitting to pretrial proffer sessions, and Pijon and Sachs were ineffective for failing to move to strike or otherwise object to use of the proffer (Ground Four). Brunt also contends that his appellate counsel, Brian Mullins, was ineffective for failing to argue on appeal that the jury instructions improperly defined a financial institution (Ground Five). (ECF No. 1, Pet.; ECF No. 19, Pet'r's Reply.)

Brunt now seeks to assert the following eight claims: trial counsel were ineffective for stipulating that the financial institutions allegedly defrauded were FDIC-insured institutions, which led to an erroneous jury instruction (Ground One); trial counsel were ineffective for failing to move for a severance from the trial of Brunt's codefendant Charles Murphy after it was learned that Murphy had sought to hire a hit man to kill Brunt and his codefendant Tracey Scullark, with whom Brunt is in a long-term relationship (Ground Two); (3) trial counsel were ineffective for failing to convey a formal plea offer (Ground Three); (4) trial counsel were ineffective with respect to the proffer sessions (Ground Four); appellate counsel John Sullivan was ineffective for "abandon[ing]" Brunt after remand, thus causing Brunt to "lose" his right to appeal the Court's amended judgment (Ground Five) and causing Brunt to lose the opportunity to argue that he was entitled to a reduced

4

sentence on remand pursuant to Amendment 792 to the Guidelines (Ground Six);[1] trial counsel were

ineffective for failing to object to the sentencing enhancement for the use of sophisticated means and

for failing to argue that Brunt was only a "minor participant" in the scheme (Ground Seven); and trial

counsel were ineffective for failing to timely object to, or cross-examine on, a codefendant's

presentation of inculpatory evidence against Brunt (Ground Eight). (ECF No. 45-1, 3d Am. Pet.)

The government contends that the Court should deny Brunt leave to amend as to proposed

Grounds Two, Five, Six, Seven, and Eight. The Court agrees. The original claims pertain to the

FDIC-insured status of entities at issue in the indictment and argument on the definition of a

financial institution; the alleged failure to convey a formal plea offer; and alleged ineffectiveness

with regard to the proffer. Grounds Two, Five, Six, Seven, and Eight pertain to severance; appeal

of the amended judgment; sentence reduction pursuant to Amendment 792; failure to object to

sentencing amendments; and failure to object to inculpatory evidence at trial. These claims are

supported by facts that are distinct "in both time and type," *see Mayle*, 545 U.S. at 650, from those

set forth in the original petition. Therefore, they do not relate back to the original petition (which

was filed shortly before the limitations period ran), and are thus time-barred.

The government does not object to the amendment of Brunt's petition as to Grounds One,

Three, and Four of the proposed third amended petition, and those claims are based on the same core

---

[1]

In a letter to the Court dated October 7, 2019 that references this case number and his § 2255 petition, Brunt asks the Court to "[p]lease accept this letter application as a motion," and he requests resentencing. (ECF No. 49.) In the letter, Brunt reiterates his argument that Sullivan "abandon[ed] his duty" and caused Brunt to fail to raise sentencing issues on remand (including the calculation of the loss amount, the application of an enhancement for the number of victims, and other "misapplied guidelines") and to fail to request a resentencing. The Court construes Brunt's letter as a motion to amend his § 2255 petition to assert these claims, and that motion is denied for the same reasons discussed herein.

of facts as Grounds One, Two, Three, and Four of the original petition. Indeed, the claims are largely the same; Brunt has simply expanded on some of his arguments. The Court has considered all of the arguments Brunt presents as to Grounds One, Three, and Four of the proposed third amended petition and the five grounds of the original petition, whether set out in the original petition or subsequent amendments, and will discuss them below.

Accordingly, the Court grants Brunt's motion for leave to file a third amended § 2255 petition as to proposed Grounds One, Three, and Four, and denies the motion as to proposed Grounds Two, Five, Six, Seven, and Eight.

**B.    Section 2255 Petition**

Section 2255 allows a defendant to move to vacate, set aside, or correct a sentence that was imposed in violation of the Constitution or laws of the United States, was imposed by a court that lacked jurisdiction, was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). A court may deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show" that the defendant is not entitled to relief. *Id.* § 2255(b). Relief under § 2255 "is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013); *see also Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (§ 2255 relief "is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process").

Ineffective-assistance claims are analyzed under the two-part *Strickland* test. *United States v. Lindsay*, 157 F.3d 532, 534 (7th Cir. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 688

(1984)). Under *Strickland*, Brunt must show (1) deficient performance, *i.e.*, that counsel's representation fell below an objective standard of reasonableness, and (2) that as a result Brunt was prejudiced, such that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *See United States v. Jansen*, 884 F.3d 649, 655-56 (7th Cir. 2018). "Because counsel is presumed effective, a party bears a heavy burden in making a winning claim based on ineffective assistance of counsel." *Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006) (internal punctuation and citation omitted). A petitioner must identify specific acts or omissions that are alleged to have fallen below professional norms. *Strickland*, 466 U.S. at 690. If one prong of the *Strickland* test is not satisfied, it is unnecessary to reach the other prong. *Id.* at 697.

### 1. Grounds One, Two, and Five[2] - Financial Institutions

In certain of the mail and wire fraud charges of which Brunt was convicted, the government alleged that the conduct at issue affected or influenced "financial institutions," in that defendants defrauded several banks and mortgage-lending institutions, among them Wells Fargo Bank, N.A.; Wells Fargo Home Mortgage; National City Bank; National City Mortgage; and JP Morgan Chase Bank. (Case No. 07 CR 853, ECF No. 183, 5th Superseding Indictment.) The indictment further alleged in relevant part that Wells Fargo Home Mortgage was the mortgage-lending division of Wells Fargo Bank, a financial institution, the deposits of which were insured by the FDIC; National

---

2

The Court refers to the grounds of the petition as numbered in the original petition. Although Brunt did not include in his proposed third amended § 2255 petition the claim regarding attorney Mullins that was originally labeled Ground Five, the Court will presume that Brunt did not intend to abandon it.

City Mortgage was the mortgage-lending division of National City Bank, a financial institution, the deposits of which were insured by the FDIC; and Chase Manhattan Mortgage Corporation was the mortgage-lending division of JP Morgan Chase Bank, a financial institution, the deposits of which were insured by the FDIC. (*Id.* at 3.) At trial, the defense stipulated that Wells Fargo Bank, National City Bank, and Chase/First American Bank were financial institutions insured by the FDIC. (Case No. 07 CR 853, ECF No. 620, Trial Tr. of Mar. 14, 2013, at 2614.)

For the fraud counts, the jury was instructed that the government was required to prove beyond a reasonable doubt that, among other things, the scheme "affected a financial institution"; a "financial institution" includes an entity that is insured by the FDIC; and a financial institution is "affected" if it is exposed to a new or increased risk of loss. (Case No. 07 CR 853, ECF No. 410, Jury Instrs.) For the money-laundering count, the jury was instructed that the government was required to prove beyond a reasonable doubt that, among other things, Brunt derived money from false statements made to influence an FDIC-insured financial institution, and that the term "financial institution" includes "commercial banks, trust companies, businesses engaged in vehicle sales including automobile sales, a pawn broker, a loan or finance company, and businesses and persons engaged in real estate closings or settlements." (*Id.*)

Brunt contends in Ground One that trial counsel were ineffective for failing to properly investigate whether the "mortgage companies" at issue in the superseding indictment were FDIC-insured and thus could be considered "financial institutions." According to Brunt, had counsel so investigated, they would have discovered that the mortgage companies listed in the indictment were not FDIC-insured, so they should not have so stipulated; instead, they should have "challeng[ed] the authenticity of the indictment." (3d Am. Pet. at 1; Pet'r's Reply at 3.) Brunt contends in Ground

Two that Pijon and Sachs were ineffective for failing to challenge the money-laundering instruction with respect to the definition of a financial institution, and Brunt asserts in Ground Five that Mullins was ineffective for failing to raise the "financial institutions" issue on direct appeal.

Relief is not warranted on Grounds One or Five. As the government points out, the fifth superseding indictment alleged that the mortgage-lending *divisions* of FDIC-insured banks were at issue. Any "investigation" into the FDIC-insured status of Wells Fargo Bank, National City Bank, and JP Morgan Chase Bank would have revealed that those entities were indeed insured by the FDIC. Trial counsel's stipulation was therefore entirely proper. Brunt maintains, however, that the entities involved were not divisions of FDIC-insured banks at the relevant time (the scheme took place from 2002 to 2006), but rather wholly independent subsidiaries that were not FDIC-insured and therefore not "financial institutions." In support of this contention, Brunt cites and attaches to his filings what he calls "public, open source" evidence. (Pet'r's Reply at 5.)

As to Wells Fargo, Brunt relies on a February 2018 Bloomberg report titled "Company Overview of Wells Fargo Home Mortgage, Inc.," which states that Wells Fargo Home Mortgage, Inc. "operates as a subsidiary of Wells Fargo Bank, National Association." (*Id.*, Ex. A.) The document does not establish the status of Wells Fargo Home Mortgage as a subsidiary, rather than a division, of Wells Fargo Bank in 2002 and 2003, the time the charged conduct occurred. As to National City, Brunt relies on an undated Wikipedia entry that refers to National City Mortgage as

a "subsidiary" of National City Corporation. (*Id.*, Ex. B.) Reliability concerns aside,[3] the entry does not support Brunt's contention that National City Mortgage was a subsidiary, rather than a division, of National City Corporation at the time the charged conduct occurred. As to Chase, Brunt relies on a document issued by the Office of the Comptroller of the Currency in 2007. It describes JP Morgan Chase Bank and states that on January 1, 2005, Chase Manhattan Mortgage Company was merged into another Chase entity, Chase Home Finance, LLC. (*Id.*, Ex. C.) Contrary to Brunt's assertion, the document does not establish that the mortgage company was an independent subsidiary of the bank at the time the charged offense occurred. Brunt also relies on a letter from the FDIC, dated December 29, 2017, in which the FDIC states that it does not insure mortgage companies. (*Id.*, Ex. E.) Like Brunt's other submissions, the letter fails to support his "subsidiary" theory; it does not show that the entities charged in the indictment were independent subsidiaries at the time of the charged events. Since Brunt fails to demonstrate that trial counsel were ineffective for failing to further investigate the FDIC-insured status of the entities at issue in the indictment or for failing to argue that they were not "financial institutions," in turn he fails to demonstrate that appellate counsel was ineffective for failing to raise an ineffectiveness claim on these grounds.

In Ground Two, Brunt maintains that trial counsel should have challenged the money-laundering instruction's definition of "financial institution," because the instruction did not track the language of 18 U.S.C. § 20—a general provision of the criminal code that defines the term "financial

---

[3]

    While Wikipedia may be useful in everyday life, it is not necessarily a reliable source of information for evidentiary purposes. *Fleishman v. Cont'l Cas. Co.*, No. 09 C 414, 2011 WL 5866264, at *4 (N.D. Ill. Nov. 22, 2011) ("As useful as Wikipedia is as an information source, a Wikipedia entry is not admissible evidence. Wikipedia is subject to edits by almost anyone with an Internet connection . . . ."), *aff'd*, 698 F.3d 598 (7th Cir. 2012).

institution"—as it existed at the time of the charged conduct. While Brunt is correct that the instruction did not track the language of § 20, an objection on that ground would have failed. The instruction was limited to the money-laundering charge, and it was drawn from the pattern criminal Seventh Circuit Federal Jury Instruction that defined the term "financial institution" for purposes of 18 U.S.C. § 1957, the particular money-laundering statute that Brunt was charged with violating. The Court added a phrase incorporating pawnbrokers and loan or finance companies, pursuant to the committee comment to the pattern instruction, which stated that "[f]inancial institutions are defined in 31 U.S.C. § 5312(a)(2), and specific cases may require giving the statutory language to the jury." Seventh Circuit Federal Jury Instructions-Criminal at 313 (West 1999). Section 5312(a)(2) identifies pawnbrokers and loan or finance companies as "financial institutions." 31 U.S.C. § 5312(a)(2)(O), (P). The instruction did not misstate the law and would not have confused the jury. Therefore, relief is not warranted on Ground Two.

### 2.     Ground Three - Plea Offer

Next, Brunt contends that Steinback, Beaumont, Pijon, and Sachs were ineffective for failing to communicate a "formal plea offer" to him. In his original petition, Brunt does not develop this argument. He merely cites a transcript from proceedings "on or about January 7, 2011," which contains a dialogue between the Court and Beaumont. (Pet. at 13.) It is necessary to provide some background. The previous month, Brunt, expressing dissatisfaction with Steinback and Beaumont, had moved to substitute attorneys, and Steinback and Beaumont had moved to withdraw. In a sealed proceeding on January 6, 2011, at which Steinback was not present due to illness, the Court discussed the motions with Beaumont. When the Court inquired about counsel's specific communications with Brunt about a possible plea deal with the government, Beaumont stated that

11

although his understanding was that Steinback and Assistant United States Attorney Brian Netols had "apparently negotiated" a plea agreement, and that "basically [the government was] going to agree to whatever demands Mr. Steinback was making to get in the plea agreement," Beaumont "didn't have anything to do with the direct negotiations with the government at all." (Case No. 07 CR 853, ECF No. 694, Tr. of Jan. 6, 2011 Hr'g, at 18.) The Court sought more specific answers about the communications between Brunt and his attorneys, so the motions were continued for hearing until the following day so that Steinback could appear or file a written submission on the matter.

The following day, Steinback submitted a seventeen-page memorandum in which he provided a detailed description of his communications with Brunt throughout the case and indicated that the government had not yet provided Brunt with a draft written plea agreement by the time Brunt sought to discharge Steinback and Beaumont. (Case No. 07 CR 853, ECF No. 246.) Steinback stated that by January 2010, he and Brunt agreed that in light of information that Brunt had provided to Steinback, it would appropriate for Brunt to engage in a proffer with the government. Steinback related that Brunt was very interested in pursuing a plea agreement and that Brunt participated in three proffer sessions with the government. Shortly thereafter, the government returned a superseding indictment that added at least one previously-uncharged defendant. Subsequently, Brunt surprised Steinback by stating that he was considering going to trial rather than pleading guilty, but after further discussions, Brunt remained interested in continuing to pursue plea negotiations. Brunt was also very concerned about what might happen to Scullark. Steinback further stated that throughout the remainder of 2010, he repeatedly asked the government for a draft written plea agreement, and Netols advised him that the government was still investigating, would likely seek

12

another superseding indictment, and that it was in Brunt's best interests to wait for a draft plea agreement. In late November and early December, Brunt professed his innocence to Steinback and expressed a desire for new counsel, as well as frustration about "being strung along by the government" when no proposed plea agreement was forthcoming. (*Id.* at 15.) On November 30, 2010, the fifth superseding indictment was filed, and Brunt sought a substitution of attorneys two weeks later.

On January 7, 2011, the Court held a continued hearing on Brunt's motion to substitute counsel and counsel's motion to withdraw from representation, and the Court heard from Brunt and Beaumont about the previous communications among Brunt, Steinback, and Beaumont. When the Court asked Beaumont whether the government had proposed a plea agreement in the case, the following exchange ensued:

> THE COURT: Did the government ever propose a plea agreement to you?
> MR. BEAUMONT: No. He—they proposed one to Mr. Steinback, yes.
> THE COURT: When?
> MR. BEAUMONT: I don't know the exact date, but I know that they proposed the terms—I know the terms of the plea agreement. The terms of the plea agreement—
> THE COURT: And did the defendant say, "I'll take it"?
> MR. BEAUMONT: No. But I had had no contact with the defendant in that process.
> . . .
> THE COURT: So if [Brunt] said no to the plea that was ultimately offered, who was going to try the case?
> MR. BEAUMONT: It would be me, but—
> THE COURT: Did he ever say yes to the plea?
> MR. BEAUMONT: My understanding is, yes, he was going to plea. He—
> THE COURT: So your understanding is that [Brunt] agreed to plead guilty?
> MR. BEAUMONT: Yes, absolutely.
> THE COURT: Really? To what terms?
> MR. BEAUMONT: The terms he—he provided substantial assistance to the government. He was going to get a plea agreement that was going to give him 50 percent off of the guidelines.
> THE COURT: But what were the terms of the plea agreement that he agreed to; that he said, yes, I'll plead guilty to?
> MR. BEAUMONT: He was going to get 50 percent off the guidelines. That

13

enhancement for role and so forth were going to be—

THE COURT: Who told you that he said he would plead guilty to that?

MR. BEAUMONT: I'm sorry?

THE COURT: Who told you that he said he would plead guilty?

MR. BEAUMONT: Mr. Steinback. Mr. Steinback's position was he was going to plead.

THE COURT: Have you read [Steinback's] statement that he submitted to me?

MR. BEAUMONT: Yes.

THE COURT: Does it say anywhere in there that this defendant at any time agreed to plead guilty?

MR. BEAUMONT: It says [Brunt] agreed with Mr. Steinback that he wants him to pursue that course of action. Absolutely it says that.

THE COURT: That's not what I'm asking you. Does it say in there anywhere—

MR. BEAUMONT: It says—

THE COURT: —at any point in time that he agreed to a guilty plea?

MR. BEAUMONT: No.

THE COURT: So it was never presented to you that he had agreed to a guilty plea?

MR. BEAUMONT: It was presented to me that he had agreed to a course of conduct that was going to result in a guilty plea, yes.

THE COURT: It was never presented to you that he had agreed to a guilty plea?

MR. BEAUMONT: No.

THE COURT: Now, you've been an attorney long enough to know that until you get the terms of the plea agreement, you don't know if the client is going to accept the plea or not, right?

MR. BEAUMONT: But I—yes, that's correct, Judge. But I also know—

THE COURT: I think it's correct.

MR. BEAUMONT: —that at that juncture where a defendant has gone in and proffered, provided substantial assistance to the government, the government has relied on that information, they've brought new indictments based on that information, I know that the course of action is that defendant is ultimately going to plead. That's just the way it works.

THE COURT: Always? And there's no possibility that he won't plead?

MR. BEAUMONT: Well, of course there's a possibility he's not going to plead.

(Case No. 07 CR 853, ECF No. 703, Tr. of Jan. 7, 2011 Hr'g, at 27-30.) At the conclusion of the hearing, the Court expressed dismay at the fact that Steinback and Beaumont had failed to prepare for trial, which was scheduled for January 31, 2011 (a date that had been set in June 2010), despite their not "having a plea agreement in hand that [Brunt] has agreed to." (Case No. 07 CR 853, ECF No. 695, Tr. of Jan. 7, 2011 Hr'g, at 38.) On January 11, 2011, the Court granted Steinback and

14

Beaumont's motion to withdraw and appointed Pijon as counsel for Brunt. The trial date was subsequently reset to October 2011.

Portions of the transcripts mentioned above, as well as Steinback's letter, were sealed, and the Court unsealed them for purposes of the instant proceeding. The Court also directed the government to exhaust its efforts in searching for any written plea offer that had possibly been made to Brunt. In its response to Ground Three of Brunt's petition, the government notes that Brunt provides no details regarding the formal plea offer that he claims was never presented to him. The government also submits the affidavit of Netols, who confirms that he had a series of proffer sessions with Brunt beginning in January 2010 and that he had several conversations with Steinback regarding the possibility and terms of a plea agreement. (ECF No. 31-1, Aff. of Brian Netols ¶¶ 3, 5.) Netols states that the parties were unable to come to an agreement regarding the terms of a possible plea for Brunt because, as a condition of pleading guilty and cooperating with the government, Brunt wanted the government to agree to dismiss all charges against Scullark, and the government was unwilling to do so. Netols further states that he has only one initial rough draft of a plea agreement for Brunt, which he saved to his computer database on January 20, 2010; the draft was incomplete and never finalized because the parties were unable to reach an agreement; he did not provide the draft to Steinback, since the parties were unable to agree on the terms of an agreement; no written plea offer ever existed in this case for Brunt; he did not provide Steinback with a formal plea offer; he did not seek the U.S. Attorney's approval for a plea agreement for Brunt; and the U.S. Attorney never approved any formal plea terms. Netols also states that he never provided Brunt's substitute counsel, Pijon and Sachs, with a draft plea agreement or a formal plea offer, and his co-counsel did not engage in plea negotiations with Steinback, Pijon, or Sachs.

In reply to the government's submissions, Brunt amended his petition to assert, without elaboration, that he "has discovered the government offered a plea deal for not more than 1-1/2 years in prison," and that had he been made aware of the offer, he "absolutely would have accepted it instead of proceeding to trial." (ECF No. 37, Am. Pet. at 1-2.) Brunt does not say when or how he made such a discovery or provide any basis for his assertion, nor does he explain why he did not previously mention it. Brunt submits a declaration in which he states that Steinback and Beaumont "never made me aware that the government offered a 1-1/2 year plea agreement or any other offers," (ECF No. 37, Decl. of Robert Brunt at 7), but does not provide any basis for his belief that such an offer existed. Brunt also makes the curious statement that he is unaware whether Pijon and Sachs "were aware of this formal offer from the government," (Am. Pet. at 2), which contradicts his prior claim that they were ineffective for failing to convey a formal offer to him.

After the government responded to Brunt's new assertion and noted its lack of an evidentiary basis, Brunt filed his motion for leave to file a third amended petition. Brunt now asserts in the third amended petition that he "discovered the government offered a plea deal for not more than 1-1/2 years while in prison through Defense Counsel Brian P. Mullins." (3d Am. Pet. at 5-6.) Brunt cites and attaches a new declaration in which he repeats some of his prior statements and now adds: "Appointed Appellate Counsel Brian P. Mullins asked me over a phone conversation why I did not accept the 1 1/4 [sic] year plea deal offered. He stated a copy of the formal plea was in the copy of the file he contained. I requested Mr. Mullins to mail a copy of the formal plea offer he stated was in my file, but he never mailed it to me." (ECF No. 45-1, Decl. of Robert Brunt ¶¶ 5-6.) Brunt does not state when this purported conversation occurred or explain why he did not include it in his numerous prior filings over several months, nor does he include an affidavit from Mullins or any

16

other evidence to support his statement.

The upshot of this lengthy discussion of the procedural history of the criminal case and Brunt's contentions in his current petition and amendments is this: Brunt fails to meet his burden of "providing detailed and specific factual allegations" that warrant an evidentiary hearing or relief on Ground Three. *See Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015); *Gallo-Vasquez v. United States*, 402 F.3d 793, 798 (7th Cir. 2005). In *Martin*, the Seventh Circuit was confronted with a claim similar to Brunt's, and it held as follows:

> A claim of ineffective assistance of counsel with respect to the plea negotiation process presupposes the existence of a plea agreement. Before requiring the district court to reopen a petitioner's case, *Gallo-Vasquez* sensibly requires *some* threshold showing of the evidentiary basis, beyond mere conclusory allegations, that supports a finding that the government in fact offered a plea deal. This preliminary burden is not meant to be onerous. It may be satisfied in a number of ways—a copy of the proposed agreement, correspondence concerning the plea, an affidavit from counsel, a statement as to when or by whom the offer was made, a detailed account of the material terms of the plea agreement, an entry on the docket setting a date for change of plea, etc. Because Martin has failed to present *any evidence*, apart from his vague and conclusory allegations, showing that the government in fact offered a 30-year plea agreement, we hold that the district court did not abuse its discretion in summarily dismissing his petition.

789 F.3d at 707. Like Martin, Brunt has failed to present any evidence, beyond conclusory, vague, and hearsay contentions, that the government made any formal plea offer (or any plea offer at all, for that matter). Brunt does not submit any of the types of evidence identified by the Seventh Circuit, such as an affidavit from counsel, that would suffice to make the required threshold showing. In his earlier filings, Brunt relied solely on Beaumont's statements to the Court. Brunt argues that Beaumont "admit[ted]" that the government offered a plea, (3d Am. Pet. at 6), but it is clear from Beaumont's exchange with the Court that to the extent Beaumont was making such a representation, it was not based on personal knowledge. (Nor was Beaumont aware of the material terms of any

17

agreement.) Beaumont was not personally involved in plea discussions with the government, and he never stated that he was told about a formal plea offer. Rather, Beaumont relied on what Steinback had told him about possible *terms*, and Steinback represented to the Court that there was no formal plea offer. Furthermore, Netols, the only Assistant United States Attorney who discussed a possible plea for Brunt, unequivocally states in his affidavit that he made no formal plea offer to Steinback and that no written plea offer ever existed. Brunt's eleventh-hour, vague, and unsupported contention that Mullins told him that he had a copy of a "formal plea" is insufficient.

Even if Brunt could show that he was offered a plea deal, he cannot show prejudice, because he has not shown that he would have accepted the offer. "In this context, prejudice means 'a reasonable probability that, but for counsel's inadequate performance, [petitioner] would have accepted the government's offer." *Gallo-Vasquez*, 402 F.3d at 798 (quoting *Paters v. United States*, 159 F.3d 1043, 1047 (7th Cir. 1998)); *see also Mitchell v. United States*, 846 F.3d 937, 941 (7th Cir. 2017). As in *Gallo-Vasquez*, here the record "does not leave room for a reasonable probability that" but for counsel's performance, Brunt would have accepted a plea agreement. 402 F.3d at 798-99. On January 7, 2011, Brunt told the Court that he had "never" told Steinback that he would consider pleading guilty. (Case No. 07 CR 853, ECF No. 703, Tr. of Jan. 7, 2011 Hr'g, at 12.) Steinback indicated in his memorandum to the Court that Brunt had told him in November and December 2010 that he was not likely to accept even a favorable plea agreement, given his concern for Scullark. Netols states in his affidavit that the government was unwilling to dismiss the charges against Scullark, and, even after Steinback withdrew and substitute counsel appeared for Brunt in early 2011, Brunt was still unwilling to enter into a plea agreement unless it provided for dismissal of the charges against Scullark. Brunt subsequently went to trial and took the stand, denying knowledge

of the scheme and attempting to minimize his involvement. Now, Brunt says that he would have pleaded guilty, but simultaneously continues to assert his innocence: "Even though I still profess my innocence in this matter, I would have accepted a 1-3 year plea agreement in the best interest of myself and family." (ECF No. 45-1, Brunt Decl. ¶ 4.) Because even at this juncture Brunt refuses to acknowledge his full culpability as would be required under a plea offer, he cannot show prejudice. *See, e.g., Thompson v. United States*, 732 F.3d 826, 830 (7th Cir. 2013).

### 3. Ground Four - Proffer

Brunt asserts in Ground Four that Steinback and Beaumont were ineffective for "misleading" him to participate in proffer sessions without counsel present and without informing him about the nature of a proffer and that the statements he made during the sessions could be used against him were he to proceed to trial and testify. (Pet. at 14; Am. Pet. at 2-4; 3d Am. Pet. at 6-9.) Brunt also argues that Pijon and Sachs were ineffective for failing to move at any point to strike or limit what Brunt deems the "illegal proffer." (Pet. at 14.)

Brunt does not provide specific facts to describe his communications with counsel or how counsel allegedly "misled" him into participating in a proffer. He simply states in his declarations: "Attorneys Jeffrey Steinback and Beaumont never fully explained to me what a proffer session was, or the consequences of proceeding to trial after participating in proffer sessions." (ECF No. 37, Brunt Decl. ¶ 2; ECF No. 45-1, Brunt Decl. ¶ 2.) Brunt does not explain what he means by the phrase "'fully' explained" or what, in particular, he did not understand. A hearing is not necessary when a petitioner makes allegations that are vague or conclusory, rather than "detailed and specific." *Martin*, 789 F.3d at 706. Moreover, at the initial proffer session, Brunt was given and signed a proffer letter stating as follows:

Dear Mr. Steinback:

As you have discussed with Assistant United States Attorneys Brian Netols and James Kuhn, the government is conducting a grand jury investigation regarding allegations concerning fraudulently obtained mortgages. Of course, the government welcomes any information that may aid it in reaching a proper determination of this matter. Accordingly, the government seeks a proffer of the testimony of your client, Robert Brunt, regarding his knowledge of the facts underlying the investigation.

The government requires a completely truthful statement of your client in this proffer. Anything related to the government by you or your client during the proffer cannot and will not be used against your client, Robert Brunt, in the government's case-in-chief or in aggravation of your client's sentence, in accordance with Sentencing Guideline 1B1.8. However, the government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client. Furthermore, if your client should subsequently testify contrary to the substance of the proffer, or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury.

This letter embodies the entirety of the agreement to make a proffer of your client's testimony. No other promise or agreement exists between your client and this office regarding the proffer. Please have your client read this letter, sign the acknowledgement copy and return it to Assistant United States Attorney James Kuhn.

(ECF No. 32-1, Proffer Letter at 1-2.) Netols avers that at the initial proffer session, he read the proffer letter to Brunt and explained its terms to him, and Brunt said that he understood the terms of the letter. (Netols Aff. ¶ 4.) Brunt does not dispute that he signed the letter beneath the statement "I, ROBERT BRUNT, read the above letter, discussed its provisions with my attorney and voluntarily agree to its terms." (Proffer Letter at 2.) Thus, the record belies Brunt's vague claims that he did not understand what a proffer was and that he was not advised of the ways in which the government could use his proffer statements.

As for legal representation at the proffer sessions, there appears to be no dispute that

Steinback was not in attendance for the bulk of Brunt's proffer sessions.[4] Brunt's argument that trial counsel should have objected to use of his proffer statements at trial is undeveloped, but he appears to assert that the objection should have been based on the lack of representation. The Sixth Amendment guarantees a defendant the effective assistance of counsel at "critical stages of a criminal proceeding." *Lee v. United States*, --- U.S. ----, 137 S. Ct. 1958, 1964 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012)). The case law Brunt cites in support of his argument that the absence of counsel during a proffer session constitutes ineffective assistance of counsel does not stand for that proposition. The Seventh Circuit has not decided whether a proffer session constitutes a "critical stage" of criminal proceedings, but it has used a prejudice analysis to determine whether an attorney's absence at such a session warrants relief under § 2255. *See Michener v. United States*, 499 F. App'x 574, 578 (7th Cir. 2012).

Brunt does not attempt to articulate how Steinback's absence from the proffer sessions prejudiced him. He does not discuss the substance of the sessions, the subject matter, or any specific statements he made at those times, nor does he say what he would have done differently had Steinback or other counsel been present. Brunt does complain that certain statements he made

---

[4]

On January 7, 2011, Brunt described the proffer sessions to the Court as follows: "I proceeded to go in with [Steinback]. The first day [Steinback] introduced me to [Netols], at this time, I didn't understand it was a proffer or none of that. I didn't really know what that was until after I start talking to other attorneys. So [Steinback] sat in there for a few minutes and then he left. Then they sent me two or three more times to see the government. . . . [T]he next time . . . Mr. Steinback was there, but he didn't stay for the proceedings. He left . . . [a]nd I'm looking and I'm saying, well, man, where's my attorney. . . . And then I was in there with them by myself. But I didn't feel nothing was wrong because the only thing I was fitting to tell them was the truth anyway." (Case No. 07 CR 853, ECF No. 703, Tr. of Jan. 7, 2011 Hr'g, at 9-10.) Steinback stated in his memorandum to the Court that he attended Brunt's first proffer session, but not two subsequent sessions.

during the proffer were used to impeach him at trial; on recross-examination, the government was allowed to impeach him with limited portions of his proffer statements regarding his knowledge of the falsity of certain property appraisals. (Case No. 07 CR 853, ECF No. 626, Trial Tr. of Nov. 10, 2011, at 3879-3882.) But Brunt does not contend that the government used the information he provided in violation of the terms of the proffer agreement; indeed, its terms expressly provided that the government could use inconsistent statements for impeachment purposes at trial. Nor does Brunt show that he suffered prejudice as a result of the government's limited use of his proffer statements. Brunt argues, in conclusory fashion, that had he not been impeached with those statements, "the jury would have believed his testimony[,] returning a verdict of not guilty." (3d Am. Pet. at 9.) That notion is untenable. As the government points out, its case in chief lasted several weeks, and on appeal the Seventh Circuit characterized the evidence against Brunt and his co-defendants as "overwhelming." 749 F.3d at 663. Brunt further argues that his proffer statements "ultimately [were] the basis for [his] sentencing enhancements." (Pet. at 14.) But he does not identify which sentencing enhancements he asserts were affected by the use of his proffer and fails entirely to develop the argument in any of his briefs, so it is waived. *See United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) ("Because it is not the obligation of this Court to research and construct the legal arguments available to parties, these arguments are waived and warrant no discussion.") (citation omitted).

### C.     Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2255 Proceedings, the Court must issue or deny a certificate of appealability when it enters a final order adverse to the petitioner. The Court declines to issue a certificate of appealability. A certificate of appealability may issue only if a

petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Brunt has failed to show that reasonable jurists (1) would find this Court's assessment of the constitutional claims "debatable or wrong," or (2) would find it debatable "whether the petition states a valid claim of the denial of a constitutional right" and "whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

Robert Brunt's motion for leave to file a third amended § 2255 petition [45] is granted as to proposed Grounds One, Three, and Four and denied as to proposed Grounds Two, Five, Six, Seven, and Eight. Robert Brunt's motion for resentencing [49] is denied. Robert Brunt's petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 [1], as amended, is denied. The Court declines to issue a certificate of appealability. Civil case terminated.

**DATE**: October 31, 2019

**Ronald A. Guzmán**
**United States District Judge**